

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RICKEY BONE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 04 C 7228 |
| vs. ) | |
| ) | Magistrate Judge Schenkier |
| JO ANNE B. BARNHART, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Rickey Bone, seeks judicial review of a final decision denying his application for Disability Insurance Benefits and Supplemental Security Income under Sections 405(g) and 416(i) of the Social Security Act. 42 U.S.C. §§ 405(g), 416(i) (2004). Mr. Bone filed his initial application on January 22, 2003, alleging a disability date of April 18, 2002 (R. 104-06, 419-20). Mr. Bone's claim was denied initially in March 2003 (R. 417, 421-425), and on reconsideration on July 16, 2003 (R. 426-29). Mr. Bone then filed a request for hearing (R. 88). Pursuant to that request, an administrative hearing was held before an Administrative Law Judge ("ALJ") on January 28, 2004 (R. 27-75).

Mr. Bone's application was denied by the ALJ in a written decision dated January 30, 2004 (R. 17-24).[1] Mr. Bone sought review of the ALJ's unfavorable decision on March 27, 2004 (R. 13). The Appeals Council denied Mr. Bone's request for review on September 10, 2004 (R. 5-7), making the ALJ's decision the final decision of the Commissioner. This lawsuit followed.

---

[1] This date is not a typographical error. The record indeed reflects that the ALJ issued a written decision two days after the hearing. We applaud the expedition with which the ALJ discharged his responsibilities.

Mr. Bone has moved for summary judgment, asking that this Court reverse the Commissioner's decision or, in the alternative, remand the case for further proceedings (doc. # 10). The Commissioner has filed a cross-motion for summary judgment to affirm the decision below (doc. # 15). By consent of the parties, pursuant to 28 U.S.C. § 636(c), the case has been reassigned to this Court for all purposes, including entry of final judgment (doc. ## 7-9). For the reasons stated below, the Court denies Mr. Bone's motion for summary judgment, and grants the Commissioner's motion for summary judgment.

## I.

We begin with a discussion of the evidence concerning Mr. Bone's personal and medical history, followed by a summary of the hearing testimony and ALJ's written decision.

### A.

Mr. Bone was born on February 9, 1958, making him 45 at the time of the hearing (R. 32, 101). He is 5 feet 9 inches tall and weighs approximately 180 pounds (R. 33). Mr. Bone was married from 1981 to 1997, and has four children who – at the time of the hearing – ranged from 18 to 22 years old (R. 32, 104). Mr. Bone was divorced in 1997, and lived with his mother for the two years leading up to the hearing (R. 32, 104).

Mr. Bone is literate, has completed high school, and has received no formal education since then (R. 32-33). From 1996 until April 2002, Mr. Bone was employed by Sheridan Corporation in a janitorial position (R. 133, 37). That job involved physical labor including window cleaning, floor buffing, removing trash, minor plumbing, and lifting as much as fifty pounds (R. 38-39). Mr. Bone was on his feet the whole day excepting short breaks (R. 39-40). Before that, Mr. Bone worked as a janitor for a factory from 1993 to 1996, and at a veteran's hospital as an assistant cook from 1978

to 1999 (R. 133). At the time of the administrative hearing, Mr. Bone had not worked since April 18, 2002, when he left his janitorial position after a back injury brought on by sneezing while lifting an object (R. 34-35). At the time of the hearing, Mr. Bone had a Workmen's Compensation case pending against his employer (R. 36).

## B.

The April 2002 injury was not the first time Mr. Bone had sustained a back injury. In February 2001, Mr. Bone injured his back injury while at work (R. 36). As a result of that injury, Mr. Bone was diagnosed with a large sequential left L4-5 nerve root compression (R. 459). In June 2001, Mr. Bone underwent surgery, which involved a left L4-5 microlaminectomy and discectomy, with decompression of the left L5 nerve root (R. 463). Mr. Bone made a good recovery from this surgery. On July 13, 2001, Mr. Bone's treating physician, Dr. Michael Kornblatt, found that Mr. Bone was "doing very well," was taking no pain medication, and was able to perform "light and sedentary work duties" (R. 464). On August 25, 2001, Dr. Kornblatt increased the level of work that Mr. Bone could perform to include lifting ten pounds, and noted that Mr. Bone was "doing as well as can be expected" (R. 379). Thereafter, on October 7, 2001, Dr. Kornblatt released Mr. Bone to return to work without restrictions, effective October 15, 2001 (R. 380).

Mr. Bone in fact returned to work in October 2001, but by January 2002, complained to Dr. Kornblatt about low back pain returning and tingling in his right thigh and leg (R. 381), persisting into February 2002 (R. 384). After his January appointment, Mr. Bone was prescribed Celebrex (R. 382). On February 1, 2002, Dr. Kornblatt noted that Mr. Bone was using Celebrex to treat his low back pain, and during that visit, he treated Mr. Bone with an injection of Celestone and Marcaine (R. 384). Dr. Kornblatt diagnosed Mr. Bone as likely suffering degenerative disc disease (R. 383).

However, Dr. Kornblatt did not impose any work restrictions on Mr. Bone in January or February 2002.

### C.

Mr. Bone did not see Dr. Kornblatt between February 1, 2002 and April 18, 2002, when Mr. Bone injured his back while at work (R. 462). On May 1, 2002, Dr. Kornblatt evaluated Mr. Bone (R. 385-86). Dr. Kornblatt diagnosed Mr. Bone as suffering from a lumbosactural sprain (along with degenerative disc disease and lumbar myofascitis), administered an injection of Celestone and Marcaine, and prescribed physical therapy and a course of Celebrex once a day (for inflammation) and Darvocet as needed (for pain) (*Id.*). Dr. Kornblatt said Mr. Bone was unable to work (R. 386).

Mr. Bone continued a course of physical therapy and medication over the next several months. On June 22, 2002, Dr. Kornblatt cleared Mr. Bone for light duty work as of July 1, 2002 (R. 388), but none was available (R. 389). By late August 2002, Dr. Kornblatt concluded that Mr. Bone likely would require further surgery (R. 391). In early September 2002, Mr. Bone decided to proceed with surgery (R. 392), and in October 2002, Dr. Kornblatt performed an L4-5 decompression, discectomy, decompression of the L4 and L5 nerve roots, posterolateral spine fusion L4-L5 with bone screw and rod internal fixation, local bone graft, left iliac crest bone graft, plated with growth factor and posterior lumbar interbody fusion with allograft bone block (R. 393).

Within three weeks after this surgery, Mr. Bone was walking without any radiating leg pain (R. 393). Dr. Kornblatt said Mr. Bone was "doing well" – his gait was intact, and x-rays showed that the interbody fusion was in "excellent position" and that there was "an excellent amount of bone graft in the lateral sutters and in the interbody space" (*Id.*). Dr. Kornblatt prescribed Valium at night, as well as Vicodin as needed for pain (*Id.*).

After a visit at the end of December 2002, Dr. Kornblatt wrote that Mr. Bone was "doing very well" (R. 394). He noted that Mr. Bone's preoperative back pain "was almost completely dissipated," that Mr. Bone had no radiating leg pain and was walking, and that he took only one or two Vicodin per week (*Id.*). Dr. Kornblatt further noted that Mr. Bone's gait was intact, his straight leg raise was to 90° bilaterally (an increase over what it had been in November 2002), and that his muscle strength, deep tendon reflexes and sensory examination were intact (*Id.*). Dr. Kornblatt released Mr. Bone for light and sedentary work (*Id.*).

By late February 2003, Dr. Kornblatt reported that Mr. Bone had recovered to the point where he no longer took pain medications, and only experienced intermittent right thigh discomfort with prolonged walking (R. 395). Dr. Kornblatt also noted that x-rays showed excellent bone grafting and spine alignment progress (*Id.*).

On February 23, 2003, Dr. Scott Kale performed an Internal Medicine Consultative Examination for the Bureau of Disability Determination Services during which he reviewed medical records and interviewed Mr. Bone (R. 323-326). Dr. Kale said that Mr. Bone reported a constant pain in his low back that rated as 4 to 5 on a scale of 10 (R. 324). Mr. Bone also complained about constant discomfort even during hours of sleep, due to spasms in his right thigh and calf (*Id.*). Dr. Kale said the claimant could not hop on his right leg due to pain (R. 325). But, Mr. Bone could get on and off the exam table, do the heel-and-toe walk, squat, ambulate 50 feet without a cane, grip, bear weight, and exhibit a normal gait and normal strength (R. 325-26).

On March 4, 2003, Dr. Francis Vincent, a Social Security Administration Physician, completed a residual functional capacity (RFC) assessment of Mr. Bone's ability to sustain gainful employment (R. 327-334). Dr. Vincent stated that Mr. Bone's primary impairment is his low back

pain caused by sciatica. (R. 327). He noted a normal cervical spine range of motion, gait, heel-to-toe walk, squatting ability, and strength (R. 334). Dr. Vincent opined that Mr. Bone could lift up to 50 pounds occasionally, 25 pounds frequently, and could stand/walk or sit with normal breaks for 6 hours out of an 8 hour day (R. 328). He noted limitations with respect to any frequent climbing and stooping (R. 329).

In mid-April 2003, Dr. Kornblatt once again evaluated Mr. Bone. Dr. Kornblatt reported that Mr. Bone experienced some backache with excessive walking, and moderate diminished range of motion in the lumbosactural spine and diffuse tenderness (R. 396). Dr. Kornblatt noted that Mr. Bone's gait remained intact, and there was no other decline in the stabilization of Mr. Bone's back or his physical measures (such as leg raise) (*Id.*).

Dr. Kornblatt's last evaluation of Mr. Bone was in July 2003 (R. 397-98). Dr. Kornblatt wrote that Mr. Bone was "doing as well as to be expected at almost nine months post operative" (R. 397). Dr. Kornblatt noted no change in Mr. Bone's gait and physical condition, and continued to note that x-rays revealed the results of the surgery to be good (*Id.*). Dr. Kornblatt noted that Mr. Bone took Vicodin only intermittently, and experienced weakness in his right thigh only with excessive walking (*Id.*). Nonetheless, Dr. Kornblatt stated that "presently [Mr. Bone] is unable to work," and that it would require another four months of therapy and work hardening for Mr. Bone to resume "some form of gainful employment" (*Id.*). Dr. Kornblatt offered no explanation for reaching this conclusion when, in late December 2002, he had cleared Mr. Bone for light and sedentary work (R. 394).

## D.

At the January 28, 2004 hearing, Mr. Bone testified that he typically does not do much except read the newspaper and watch television (R. 44). He lives with his mother, and claims he does not do any household work like vacuuming, sweeping, small repairs, yard-work, and shopping (R. 44-45). Mr. Bone testified that he spends about four waking hours each day lying down (R. 46). He claims to be unable to play sports anymore (R. 47). Since the surgery, he reports being able to consistently walk with a cane one-half to one block per day for his daily exercise (R. 48, 55). Mr. Bone testified that since the October 2002 surgery, he wears a back brace, is unable to tie his shoes, and has difficulty getting up from the tub and scrubbing lower extremities (R. 56-58). He also testified that he can only lift five pounds (he gave the example of his cane); lifting anything more than five pounds brings pain to his back, leg, and neck (R. 58-59). He does not attend church anymore because he cannot sit in church pews due to pain; and he no longer goes on long car rides due to pain (R. 60-61). Mr. Bone stated he has not attended prescribed physical therapy since his last office visit with Dr. Kornblatt in July 2003 because his Workmen's Compensation company went bankrupt (R. 59).

During the hearing, Mr. Bone alternated between sitting and standing to avoid pain (R. 61). He described his pain as located in the lower back, down his right leg, and his neck; but, he agreed when the judge asked if it was from the low back to the right leg (R. 49). The pain down the right leg was there after the 2001 surgery and then again after the 2002 injury (R. 50). He testified to numbness in the leg persisting since the October 2002 surgery (*Id.*). Mr. Bone claimed that since the surgery in 2001, he felt pain and numbness down his right leg for three weeks out of every four (R. 51). Mr. Bone further testified that the pain he experienced since the April 2002 incident was

similar in nature and location (R. 52). According to Mr. Bone, the pain is set off by sitting, such as when riding in a car: "I have to stand, sit, stand. Or if I lay down, then I – you know, it [won't] be as bad" (R. 53). Mr. Bone testified that he can sit only 10 to 12 minutes before the pain starts up again (R. 54), but before the second surgery in October 2002 he could sit perhaps 30 minutes (*Id.*). Mr. Bone stated he could stand only five to ten minutes at the time of the hearing (R. 64). Mr. Bone claims bad weather seems to make it worse (R. 61).

Mr. Bone testified that he takes medication (Vicodin for pain relief, Valium to relax muscles) only when the pain is really bad – perhaps once every two days (R. 56). He also testified to trying to "stretch it" over the couple of months before the hearing because he was running out of medicine and could not obtain more until his Workmen's Compensation got worked out (*Id.*). Mr. Bone said that before that time, he had been taking those medications every three hours since his October 2002 surgery (*Id.*).

During the hearing, the ALJ also received testimony from Timothy Bobrowski, a vocational expert ("VE"). All of the VE's testimony was in response to the ALJ's questions. Mr. Bone's attorney asked no questions of the VE (R. 72).

The VE testified that all of Mr. Bone's prior jobs fall within the category of unskilled or semi-skilled, medium exertion work (R. 67). The ALJ asked the VE about the types and numbers of jobs in this region that could be performed by a person with Mr. Bone's prior work history, but with the following limitations: (a) lifting and carrying no more than 20 pounds occasionally and 10 pounds frequently; (b) sitting, standing and walking for up to six hours in an eight-hour day; (c) an inability to climb ladders, ropes or scaffolds (but an ability to climb ramps and stairs); and (d) an ability to balance, stoop, kneel, crouch and crawl only occasionally. The VE testified that a person

8

with those limitations could not perform the type of medium-exertion work that Mr. Bone had previously performed, but could perform a variety of light-exertion level jobs that exist in significant numbers in the region, such as light janitorial work (5,400 jobs), hand packing (10,000 jobs), and bench assembly (14,000 jobs) (R. 68-69).

The ALJ then asked the VE whether the jobs that such a hypothetical person could perform would be affected if the limitations were altered: (a) to limit lifting and carrying to no more than 10 pounds occasionally, and lighter items "like small hand tools and individual case files on a frequent basis"; and (b) to limit standing and walking for no more than two hours in an eight-hour day, and for no longer than 10-15 minutes continuously (R. 69). The VE testified that a person with those additional limitations could not perform any light-exertion level work, but still would be able to perform sedentary work (*Id.*). As examples of such work available in this region, the VE identified sedentary hand packing (2,000 jobs), bench assembly (3,000 jobs), and sorting (1,000 jobs) (*Id.*).

The ALJ asked the VE whether the availability to perform those sedentary jobs would be affected if the hypothetical person used a cane to assist in walking (R. 70). The VE testified that this additional limitation would preclude the hypothetical person from performing the sedentary hand packing, bench assembly and sorting jobs (*Id.*). But, the VE said that a person with all of those limitations still could perform the following other unskilled, sedentary jobs in the region: systems surveillance monitor (2,000 jobs) and information clerk (1,000 jobs) (*Id.*). The ALJ, the VE testified that in order to perform these two latter jobs, as well as the hand packing, bench assembly and sorting jobs, a person would have to be able to sit for at least 30 minutes at a time before being able to stand for two or three minutes (R. 70-71).

9

Finally, the ALJ asked the VE what work a person with all of the forgoing limitations could perform, if the limitations were increased to preclude the person from lifting, carrying, sitting, standing, walking, pushing, pulling for a combined total of six to eight hours each day (R. 71). The VE responded that there is no work that such a person could perform (*Id.*).

### E.

The ALJ issued his decision on January 30, 2004, applying the standard five-step sequential evaluation pursuant to 20 C.F.R. §§ 404.1520 and 416.920 (2005). At Step 1, the ALJ found that there was no evidence of work by Mr. Bone after the alleged onset date in this case (R. 18). At Step 2, the ALJ found that Mr. Bone suffers a severe impairment – degenerative disease of the lumbar spine (*Id.*). At Step 3, the ALJ found that Mr. Bone's impairment does not meet or medically equal any of the impairments listed in the regulations as so severe that they preclude substantial gainful activity (*Id.*). At Step 4, the ALJ determined that Mr. Bone's RFC precluded him from performing his past relevant work as maintenance man, janitor, or assistant cook (all medium exertion) (R. 21-22). At Step 5, the ALJ found that Mr. Bone's RFC permitted him to perform a significant number of jobs in the Chicago metropolitan area (R. 22).

In assessing Mr. Bone's RFC, the ALJ found that Mr. Bone's medically determinable impairments resulted in the following limitations: (a) lifting/carrying up to 10 pounds only occasionally, and lighter items such as small tools such as small hand tools and individual case files frequently; (b) standing and/or walking no more than a combined total of two hours in an eight-hour day or for longer than 10-15 minutes continuously; (c) sitting, with normal breaks, for up to six hours in an eight-hour day, so long as he could alternate from a sitting position to a standing position at intervals of 30 minutes for a period of two to three minutes on each such occasion; and (d) a

10

prohibition of climbing ladders, ropes, or scaffolds, but retaining the ability to otherwise climb ramps/stairs, balance, stoop, kneel, crouch and crawl occasionally (R. 18). Based on these limitations, the ALJ found that Mr. Bone's RFC corresponded to a limited range of sedentary work (R. 22). Based on the VE's testimony, the ALJ found that there were 9,000 jobs in the region that Mr. Bone could perform notwithstanding these limitations (*Id.*). The ALJ further noted that even though the record did not "fully support" a finding that Mr. Bone requires the use of a cane to walk, the VE's testimony established that even if Mr. Bone required use of a cane, there still would remain a significant number of jobs in the region – 3,000 – that Mr. Bone could perform (*Id.*).

In reaching his findings concerning Mr. Bone's RFC, the ALJ found – after a review of Mr. Bone's testimony and the medical record – that Mr. Bone's testimony concerning greater symptoms and limitations was not "entirely credible" (R. 23). In addition, the ALJ addressed Dr. Kornblatt's July 9, 2003 conclusion that Mr. Bone was incapable of work (R. 397), but found it neither controlling nor persuasive (R. 21). The ALJ found that Dr. Kornblatt's conclusion was "not consistent with the overall record of treatment and evaluation" (*Id.*). The ALJ noted that the medical records showed improvements in Mr. Bone's progress since the surgery in October 2002 (*Id.*). The ALJ noted that at multiple evaluations, Mr. Bone displayed no problems with straight leg raising, gait, strength, reflexes, or sensory ability (*Id.*). Finally, the ALJ summarized the most recent evaluation from July 9, 2003, indicating only thigh weakness with excessive walking (*Id.*). The ALJ also noted that while Dr. Kornblatt's July 9, 2003 report did not address specific work activities, Mr. Bone's then-current work involved medium-level exertion (*Id.*). We read that as a suggestion by the ALJ that, insofar as Dr. Kornblatt's report concluded that Mr. Bone could not perform his work as

11

a janitor, Dr. Kornblatt's conclusion was not contrary to the ALJ's finding, and did not address what remaining functional abilities Mr. Bone possessed.

## II.

We turn to a brief review of the relevant legal standards. To establish a "disability" under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A)(2004). A claimant must demonstrate that her impairments prevent her from performing not only her past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A). The social security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520 (2004). Under this test, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520; *see also Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir.1992). A finding of disability requires an affirmative answer at either Step 3 or 5. A negative answer at any step other than Step 3 precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id*.

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir.1994). The Court must accept the findings of fact which are supported by "substantial evidence" (42 U.S.C. §§ 405(g) (2004)), defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron,* 19 F.3d at 333 (quotations omitted). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan,* 912 F.2d 178, 180 (7th Cir.1990); *see also Stuckey v. Sullivan,* 881 F.2d 506, 509 (7th Cir.1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Sec'y of Health and Human Services,* 969 F.2d 534, 538 (7th Cir.1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen,* 782 F.2d 79, 83 (7th Cir.1986) (per curiam).

That said, the Commissioner (or ALJ) is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence, and may not select and discuss only that evidence which favors his or her ultimate conclusion. See *Herron,* 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id;* see also *Young,* 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse

13

into the reasoning behind [the] decision to deny benefits." *See, e.g., Zurawski v. Halter,* 245 F.3d 881, 887, 889 (7th Cir. 2001) (quoting *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000)). This is especially true regarding credibility determinations, since both the case law and the regulations require an ALJ to minimally articulate the specific reasons for the credibility finding. *Zurawski,* 245 F.3d at 887. Specific reasons are required so that the reviewing Court can ultimately assess whether the ALJ's determination was supported by substantial evidence or, if not, was "patently wrong." *Id.* (quoting *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000)).

### III.

Mr. Bone's sole challenge in this case is to the ALJ's determination of his RFC, which Mr. Bone claims led to an erroneous determination at Step 5 that there are significant numbers of jobs in the national economy that Mr. Bone can perform. In particular, Mr. Bone argues that in determining the RFC, the ALJ improperly discounted (a) Dr. Kornblatt's July 9, 2003 opinion that Mr. Bone is unable to work, and (b) Mr. Bone's own testimony concerning his pain and limitations. We do not find either argument persuasive.

### A.

We begin with Dr. Kornblatt's July 9, 2003 opinion. As a treating physician, Dr. Kornblatt's opinion was entitled to controlling weight only if it was "well supported by medical findings and not inconsistent with other substantial evidence in the record." *Dixon v. Massanari,* 270 F.3d 1171, 1177 (7th Cir. 2001). In this case, substantial evidence of record supports the ALJ's finding that Dr. Kornblatt's July 9, 2003 opinion concerning Mr. Bone's ability to work was neither controlling nor persuasive.

14

The ALJ correctly pointed out that Dr. Kornblatt's reports of his assessments of Mr. Bone after his October 2002 surgery portrayed a consistent course of improvement in Mr. Bone's condition. In four assessments between November 2002 and April 2003, Dr. Kornblatt repeatedly characterized the surgical repair work as excellent; he consistently reported a decrease in Mr. Bone's level of pain and in the level of medication needed to cope with it; he noted no problems in Mr. Bone's gait; and, he cited improvement in Mr. Bone's straight leg raise as well as intact muscle strength, reflexes and sensory ability. Dr. Kornblatt's July 2003 conclusion did not describe any decline in gait, leg raise, muscle strength, reflexes or sensory ability. The report noted that Mr. Bone was experiencing "some feeling of weakness in his right thigh with excessive walking" (R. 483), which plainly would not be a condition that would disable someone from all work. The report also noted that Mr. Bone had "low back ache," but the severity of the pain from that condition must be assessed against Dr. Kornblatt's statement that Mr. Bone only used pain medication "intermittently." We cannot say that the ALJ erred in concluding that Dr. Kornblatt's July 2003 conclusion concerning Mr. Bone's inability to work was inconsistent with other substantial evidence in the record.

Moreover, the ALJ correctly pointed out that, in stating that Mr. Bone is unable to work, Dr. Kornblatt did not discuss any specific work activities, or any specific limitations in Mr. Bone's functional abilities. That shortcoming is particularly significant here because, in a report dated January 2, 2003, based on a visit on December 27, 2002, Dr. Kornblatt had cleared Mr. Bone to return to work at "light and sedentary duties" (R. 480). When comparing the reports of January 2003 and July 2003, one finds no difference in Dr. Kornblatt's assessment of Mr. Bone's gait, leg raise, muscle strength, reflexes and sensory abilities, and a decline – not an increase – in the medication

15

Mr. Bone said he required to cope with any pain (*Compare* R. 480 *and* R. 483). Yet, in his July 2003 report, Dr. Kornblatt did not refer to his earlier clearance for Mr. Bone to work on a limited basis, either to explain why the two findings were consistent or to explain why his opinion had changed.

To the extent that Dr. Kornblatt's July 2003 report referred only to Mr. Bone's ability to return to his full duties as a janitor, that would render Dr. Kornblatt's July 2003 opinion consistent with his earlier clearance of Mr. Bone for light and sedentary work. However, it also would render his July 2003 opinion concerning Mr. Bone's ability to work consistent with the ALJ's finding that Mr. Bone could not perform his prior work as a janitor. To the extent that Dr. Kornblatt's July 2003 conclusion reflects an about-face from his January 2003 conclusion that Mr. Bone could perform light and sedentary work, it was an unexplained about-face that was inconsistent with the medical record, and the ALJ was within his rights to deem it neither controlling nor persuasive.

**B.**

Mr. Bone testified to a level of pain and limitations that exceeded those that the ALJ found credible: for example, (a) an inability to lift more than five pounds (R. 58-59); (b) an inability to walk without a cane (R. 55); (c) an inability to stand for more than five to ten minutes or to sit for more than 10-12 minutes at a time without pain (R. 64); and (d) an inability to bend to tie shoes or to sleep without interruption due to pain (R. 58, 61). The evidence of record cited by the ALJ supports his conclusion that Mr. Bone's testimony on this score was not fully credible.

Mr. Bone's testimony about pain is inconsistent with the medical record of what he self-reported to Dr. Kornblatt. In his testimony, Mr. Bone said that in the few months before the hearing he could only afford to take pain medication once every two or three days; but Mr. Bone said that prior to that time, he was taking pain medication every three hours ever since his October 2002

surgery (R. 56). That is flatly inconsistent with Dr. Kornblatt's report that, within two months after the surgery, Mr. Bone had no radiating leg pain, his presurgery back pain had "almost completely dissipated," and he was taking only one to two Vicodin each week for pain (R. 480). And, subsequent reports indicated no increase in pain medication. To the contrary, by July 2003, Mr. Bone reported that he was taking one Vicodin "intermittently" (R. 483). This conflict between Mr. Bone's hearing testimony and what he told his treating physician provided substantial evidence for the ALJ's decision not to fully credit Mr. Bone's testimony about pain, and the limitations stemming from it.

Mr. Bone's testimony about walking with a cane is likewise at odds with the medical record. Mr. Bone testified that he started using the cane after his October 2002 surgery, at the suggestion of Dr. Kornblatt (R. 54). But, none of Dr. Kornblatt's reports indicate that Mr. Bone needed a cane or used one. To the contrary, on April 2003, in response to a question about the use of assistance devices to walk, such as a cane, Dr. Kornblatt wrote that the question was not applicable to Mr. Bone (R. 335-36). Likewise, in a report in March 2003, Dr. Kale noted that Mr. Bone could walk 50 feet without a cane (R. 325). There was substantial evidence for the ALJ's decision not to credit Mr. Bone's testimony about his need for a cane.[2]

## CONCLUSION

While we sympathize with Mr. Bone's condition, after review of the record and the Commissioner's decision, the Court finds that the ALJ's decision must be affirmed. For these reasons, the Court denies the plaintiff's motion for summary judgment (doc. # 10) and grants the

---

[2]We note that even if Mr. Bone's RFC limitations included the need for use of a cane, the ALJ correctly noted that, based on the VE's testimony, there would remain a significant number of jobs that Mr. Bone could perform (R. 22).

17

Commissioner's cross-motion for summary judgment (doc. # 15). The Clerk of the Court is therefore directed to enter a final judgment pursuant to 42 U.S.C. § 405(g) (Sentence 4)(2005) and FED. R. CIV. P. 58 and to terminate this case.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: July 20, 2005**